**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 17-10138-WGY-11** |
| | ) | |
| **DRAGUSH NELO HORNEA,** | ) | |
| **a/k/a "Dragos Hornea,"** | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S AMENDED SENTENCING MEMORANDUM**

On October 5, 2021, the defendant DRAGUSH NELO HOREA, a/k/a "Dragos Hornea" ("HORNEA") was the fifteenth of fifteen defendants to plead guilty in this case. HORNEA pled guilty to racketeering conspiracy and conspiracy to use counterfeit access devices and is scheduled for sentencing on February 14, 2022. **Consistent with the parties' plea agreement, the government respectfully requests that the Court impose a sentence principally of 21 months' imprisonment**.[1]

HORNEA was arrested in Germany on November 29, 2020, pursuant to an Interpol Red Notice, and subsequently detained. On April 8, 2021, HORNEA was extradited to the United States for prosecution. As of sentencing, HORNEA will have served approximately 14.5 months in custody, without credit for good time.

## I. BACKGROUND OF THE CASE

This case arose from an investigation by the FBI into an organization of Roma or Gypsy defendants engaged primarily in ATM skimming and money laundering. The group, which the

1 The government submitted a sentencing memorandum in which it requested a sentence of 27 months, which was **inconsistent** with its plea agreement. The government thanks defense counsel for drawing its attention to this error, which violated the government's agreement. With the defendant's assent, the government submits this amended memorandum requesting the agreed-upon sentence, which is sufficient but not necessary to achieve the goals of sentencing.

government called the Hornea Crew, consisted of member of several related families and was active in Massachusetts, Connecticut, New Hampshire, New York, South Carolina, North Carolina, and Tennessee. PSR ¶ 8.

In summary, the defendants engaged in all three facets of skimming: stealing account information, creating cloned bank cards, and making unauthorized withdrawals or "cashing out." In addition, members of the Crew – notably the leaders, Constantin and Ludemis Hornea – scouted locations, acquired equipment, organized travel and performed other functions. PSR ¶ 10.

DRAGUSH HORNEA was involved in a single episode from the outset of the enterprise in the summer of 2015. Members of the conspiracy had gathered at a motel in Wethersfield, Connecticut, outside Hartford. PSR ¶¶ 19-20. At the same time, some – including Minor #2 – travelled to Waltham to engage in skimming. PSR ¶¶ 16-17.

On the afternoon of August 21, 2015, agents and officers saw DRAGUSH HORNEA cash out using cloned ATM cards at an ATM in Middletown, Connecticut. PSR ¶¶ 22-27. Surveillance agents and officers saw the following: HORNEA parked on Washington Street, got out, crossed several parking lots, and entered an ATM lobby. He left the lobby while an agent entered the lobby and returned once the agent had left. PSR ¶ 22. Back inside, HORNEA used five or six, one after the other – while agents were in contact with Bank of America's law enforcement hotline, which was watching a live feed of the ATM. PSR ¶ 23.

Agents stopped HORNEA and found eight gift cards with stickers with the four digit PINs, as well as $1,500 in $20 bills. PSR ¶ 24. HORENA was arrested, charged in Connecticut state court, and absconded from the state court.

Working backwards from the cash-out, investigators learned that the cloned cards came from skimming incidents at a Bank of America ATM in Enfield, Connecticut, on August 7, 9, 10, 13, 14, 16, and 17, 2015; with additional cash-outs between August 21 and 24, 2015, at numerous ATMs in Connecticut and Massachusetts. PSR ¶ 26. The total loss associated with these skimming events was $90,425.72. PSR ¶ 27.

## II. ADVISORY SENTENCING GUIDELINES ANALYSIS

The government affirms the guidelines analysis to which the parties agreed in the plea agreement and stated to the Court at the change of plea hearing. HORNEA is base offense level 19, which the base offense level for racketeering, because it is higher than the base offense level which would apply to the substantive fraud. PSR ¶ 99.

HORNEA receives a two level enhancement for obstruction of justice, because he failed to appear in and absconded from Connecticut state court. PSR ¶ 103.

HORNEA receives a three level decrease for acceptance of responsibility, yielding total offense level 18. PSR ¶¶ 106-108. At total offense level 18, and Criminal History Category I, his guidelines sentencing range is 27 to 33 months. PSR ¶ 149.

## III. SECTION 3553(a) FACTORS

Examination of the § 3553(a) factors demonstrates that a sentence of 27 months' incarceration is warranted, reasonable, and consistent with the other defendants.

### A. Nature of the Offense and Respect for the Law

Skimming, like in this case, is a financial crime. Nevertheless, several facts stand out in this case. First, the members of this enterprise, including HORNEA, were actually stealing *identities*, not just money. So while any particular victim's losses likely did not exceed $1,000,

the pain and distress were likely far in excess to the financial cost. Second, skimming, and the ease with which HORNEA was able to complete it, harmed lots and lots of victims. In addition, HORNEA's efforts were magnified by his association with other members of the HORNEA Crew. As a result, the injuries were magnified many, many times—creating a total harm larger than the numbers would suggest.

Recent research bears out this point. Identity theft, and payment card fraud have increasingly posed a problem for financial institutions and law enforcement agencies. In 2018, the Federal Trade Commission processed 1.4 million fraud reports, identity theft being one of the top three most common categories, representing 14.85% of all reported frauds.[2] Of all identity theft reports, credit card fraud reports were the most common, with 157,688 reports.[3] Existing card fraud losses cost Americans $6.4 billion in 2018.[4] The United States leads the world in incidents of payment card fraud, accounting for 38.6% of global card fraud losses last year.[5]

Much of this fraud stems from skimming from gas stations and ATMs. In 2016, banks lost an estimated $1.3 billion to debit card fraud.[6] Approximately 54% of this fraud came from ATM skimming.[7] According to FICO, the agency that monitors ATM transactions throughout

2 *Consumer Sentinel Network: Databook 2018*, FEDERAL TRADE COMMISSION, (February 2019), *available at*: https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-2018/consumer_sentinel_network_data_book_2018_0.pdf
3 *See id*.
4 *14.4 Million Victims in 2018; Complicated Fraud Types Elevated: Javelin*, CREDIT UNION TIMES, (March 11, 2019), *available at*: https://www.cutimes.com/2019/03/11/14-4-million-victims-in-2018-complicated-fraud-types-elevated-javelin/?slreturn=20190811105943
5 *SmartMetric Reports Worldwide Payment Card Fraud Losses Reach a Staggering $24.26 Billion While the USA Accounts for 38.6% of Global Card Fraud Losses*, BUSINESS WIRE, (January 29, 2019), *available at*: https://www.businesswire.com/news/home/20190129005802/en/SmartMetric-Reports-Worldwide-Payment-Card-Fraud-Losses
6 Dave Kovaleski, *Banking Industry Suffered $2.2 Billion in Fraud Losses in 2016*, FINANCIAL REGULATION NEWS, (January 26, 2018), *available at*: https://financialregnews.com/banking-industry-suffered-2-2-billion-fraud-losses-2016/
7 *Id.*

the country, banks have reported significant increases in the number of ATM machines compromised by offenders since 2014.[8] In 2019, skimming remains the second most common type of data breach, with 77 incidents occurring within just the first three months of the year.[9]

Payment card fraud can be profitable for criminals who engage in it, but causes economic damage to society as whole. According to a representative of the American Bankers Association, ATM fraud is more profitable than bank robberies, with the average criminal making $30,000-$50,000 prior to apprehension.[10] FICO estimated that loss per card amounted to $600.[11] Payment card fraud affects the market as a whole by affecting consumer actions. Surveys suggest that 44% of Americans rely on their debit cards to complete every day purchases and that debit card skimming reduces an individual's inclination to use a debit card.[12] Fraud undermines trust in the banking institutions and causes distress to those affected by it. Accordingly, the government must seek to deter this type of criminal action and minimize its economic impact. Breaking up organized criminal entities that engage in skimming is a priority for the economic health of the country.

---

8 Ann Carrns, *A.T.M. Skimming Fraud is Surging, but You Can Take Precautions*, N.Y. TIMES, (April 8, 2016) *available at*: https://www.nytimes.com/2016/04/09/your-money/safeguarding-your-atm-information-as-fraud-escalates.html; *see also FICO Reports a 70 Percent Rise in Debit Cards Compromised at U.S. ATMs and Merchants in 2016*, FICO, March 29, 2017, *available at*: http://www.fico.com/en/newsroom/fico-reports-a-39-percent-rise-in-debit-cards-compromised-at-us-atms-and-merchants-08-31-2017

9 *Data Breach QuickView Report: First Quarter 2019 – Data Breach Trends*, RISK BASED SECURITY, INC., (April 30, 2019), *available at*: https://pages.riskbasedsecurity.com/hubfs/Reports/2019/2019%20Q1%20Data%20Breach%20QuickView%20Report.pdf

10 Penny Crossman, *How is ATM Fraud Still a Thing?*, PAYMENTSSOURCE, (April 19, 2017), *available at*: https://www.paymentssource.com/news/how-is-atm-fraud-still-a-thing

11 Ann Carrns, *A.T.M. Skimming Fraud is Surging, but You Can Take Precautions*, , N.Y. TIMES, (April 8, 2016) *available at*: https://www.nytimes.com/2016/04/09/your-money/safeguarding-your-atm-information-as-fraud-escalates.html

12 Erin El Issa, *Americans favor Debit Over Credit for Their Go-To Card*, Nerdwallet, September 7, 2017, *available at*: https://www.nerdwallet.com/blog/credit-cards/credit-debit-survey-2017/

In addition to its economic impact, payment card fraud also has a human impact. It has adverse effects for victims that can be long lasting and difficult to repair. Most victims of payment card fraud do not know how their data was compromised until receiving information from their financial institutions.[13] Nine out of ten victims of identity theft have no information about the identity of the offender.[14] Victims of identity theft reported adverse financial consequences, with two thirds of victims reporting direct financial loss.[15] In addition to financial loss, three fourths of surveyed victims reported emotional distress.[16] The consequences for a victim depend on the quick resolution of the problem by a bank.[17] The longer it takes to reach a resolution, the more adverse consequences a victim experiences.[18]

The large number of victims and the intrusiveness of their losses carve out harm across a wide swath of our community, both in Massachusetts and the rest of the country. Ultimately, victims lose confidence in the modern economy and the economy's ability to keep them and their information safe. These economic and human costs of payment card fraud necessitate a tough response to criminal offenders. The government believes that the sentences requested here will help punish that harm, promote respect for the law and generally deter others who might think to become involved in skimming.

**B. Comparison to Other Defendants**

Every defendant is sentenced independently for his own case. Nevertheless, the

---

13 Harrell. at 5.
14 *Id.*
15 *Id.*
16Identity Theft: The Aftermath 2017, IDENTITY THEFT RESOURCE CENTER, 9, (2017), *available at*: https://www.idtheftcenter.org/images/page-docs/Aftermath_2017.pdf
17 Erika Harrell, *Victims of Identity Theft 2014*, BUREAU OF JUSTICE STATISTICS, (November 13, 2017), *available at*: https://www.bjs.gov/content/pub/pdf/vit14.pdf
18 *Id.*

government's recommendation in this case is consistent with its recommendations for the other defendants and compares favorably with other defendants in the same "tier" of relative culpability. In the government's view, DRAGUSH HORNEA belongs at the bottom of the middle tier of defendants, where a sentence of 27 months is appropriate.

At the top belong CONSTANTIN DENIS HORNEA and his brother LUDEMIS HORNEA, the leaders of the Hornea Crew. They participated throughout the conspiracy (although LUDEMIS's involvement was halted by his arrest and incarceration in Massachusetts); they led the Crew; and they were involved in all facets of the criminal activity. CONSTANTIN HORNEA received a sentence of 65 months' imprisonment, with a sentencing range of 65 to 76 months) and LUDEMIS HORNEA received a sentence of 42 months imprisonment, with a sentencing range of 61 to 70 months, which incorporated a credit of 15 months served in state prison for the underlying conduct that otherwise would not have counted. As a result, CONSTANTIN HORNEA received a sentence at the low end of his respective guidelines range and LUDEMIS HORNEA effectively a sentence just four months below the low end (approximately a 10% variance), plus the mandatory consecutive term of 24 months. Also at the top was ION BONCULESCU, who was present throughout the entire length of the conspiracy, from Connecticut through South Carolina; organized and planned with them, especially with regard to the skimming device used in Quincy; and fled the country, at first successfully, until his arrest in Germany and extradition to the United States. ION BONCULESCU received a sentence of 50 months, one month below the low end.

HORNEA belongs in the middle tier of defendants, which contains the largest group of defendants. Ahead of HORNEA are the group of FLORIN HORNEA, FLORINEL VADUVA

and NICUSOR BONCULESCU, who all obtained money by cashing-out, and stole the identities of two victims. FLORIN HORNEA, FLORINEL VADUVA and NICUSOR BONCULESCU faced an identical advisory sentencing guidelines range of 21 to 27 months, plus a mandatory consecutive 24 months for the aggravated identity theft, and all received sentences of 36 months. NEMANJA MILOSAVLJEVIC faced the same guidelines range and mandatory consecutive sentence but was the beneficiary of a government motion (and was deemed less culpable than those three); he was sentenced to 27 months in total.

ION VADUVA, in addition to cashing out, took on an “elder statesman” role by creating cloned cards and repairing or creating skimming devices, but he did not commit aggravated identity. For this more significant role, the government placed him in the middle tier and he received a low end guidelines sentence of 24 months. Another defendant in this middle tier is MARIA LAZAR, who was sentenced to 27 months’ imprisonment pursuant to a C plea agreement with the government. The government agreed to recommend a below guidelines sentence for LAZAR because of what the government considered compelling mitigating circumstances: she was the mother of a young child and appeared to have become involved through the agency of her husband, lead defendant CONSTANTIN HORNEA, whom she married at a young age.

Next, in the government’s view, comes HORNEA, who cashed out and appeared to operate independently. Although he was only involved in the Connecticut episode of 2015, he was arrested at the end of it and fled the jurisdiction of the court, thereby terminating his involvement in the enterprise. HORNEA also thereby received an enhancement for obstruction. As a result, HORNEA merits a sentence of 21 months, which represents a 22% reduction from

the low end of his guidelines sentencing range. This reduction is consistent with what some other defendants have received—FLORIN HORNEA, FLORINEL VADUVA and NICUSOR BONCULESCU, described above; and DENISA BONCULESCU (in particular, who received a sentence of 21 months on a GSR of 27-33 months, although she did not cash out but did install and remove devices), ANAMARIA MARGEL, and ION TRIFU below.

Not comparable to this defendant are the final groups. First, defendants CLAUDIU FLOREA and SUEDIN CHICIU are not comparable because they were the beneficiaries of government motions. Second, bottom tier defendants ANAMARIA MARGEL and ION TRIFU have the least culpability because each participated in a single episode, did not personally cash-out themselves and played support roles (or ANAMARIA MARGEL, renting rooms and installing and removing devices in Quincy, Massachusetts; and for ION TRIFU, money laundering in connection with Quincy). ANAMARIA MARGEL was sentenced to 16 months' imprisonment, on a sentencing range of 21 to 27 months; and ION TRIFU, who was sentenced to 12 months and one day in prison on a sentencing range of 12 to 18 months. Accordingly, each defendant received either a small departure (approximately 22% or 23%) or a within Guidelines, relatively light sentence.

## IV. THE GOVERNMENT'S RECOMMENDATION

The parties reached agreement on a reasonable sentence of 21 months, based on the aggravating circumstances discussed above and the mitigating factors, discussed in the defendant's sentencing memorandum. For those reasons, and pursuant to 18 U.S.C. §3553(a), the government requests that the Court impose the following sentence:

(a) incarceration for a term of 21 months;

(b) no fine;

(c) 12 months of supervised release (for the possibility that he is not deported);

(d) a mandatory special assessment of $200;

(e) a forfeiture money judgment of $18,090.54; and

(f) restitution of $90,452.72, payable to Bank of America.

Respectfully submitted,

RACHAEL S. ROLLINS
UNITED STATES ATTORNEY

By: /s/ Timothy E. Moran
TIMOTHY E. MORAN
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I, Timothy E. Moran, Assistant U.S. Attorney, certify that I caused a copy of the foregoing sentencing memorandum to be served by email to defense counsel.

s/ Timothy E. Moran
TIMOTHY E. MORAN
Assistant U.S. Attorney

Dated: February 11, 2022